# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

_____

GEORGE JOSEPH MCNALLY, JR.,

                              Plaintiff,

      v.                                      5:14-CV-00076
                                          (MAD/ATB)

COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.

_____

STEVEN R. DOLSON, ESQ., for Plaintiff
DAVID L. BROWN, Special Asst. U.S. Attorney, for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

      This matter was referred to me for report and recommendation by the Honorable

Mae A. D'Agostino, United States District Judge, pursuant to 28 U.S.C. § 636 (b) and

Local Rule 72.3(d). This case has proceeded in accordance with General Order 18.

## I.    __PROCEDURAL HISTORY__

      On December 26, 2010, plaintiff protectively[1] filed for Social Security Disability

Insurance Benefits ("DIB"), alleging disability beginning October 1, 1997.

(Administrative Transcript ("T.") 15, 53). Plaintiff's claims were denied initially on

May 27, 2011. (T. 54-57). After a hearing on September 12, 2012, at which plaintiff

testified (T. 26-46), Administrative Law Judge ("ALJ") Marie Greener denied the

---

[1] When used in conjunction with an "application" for benefits, the term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits. *See* 20 C.F.R. § 416.340. There are various requirements for this written statement. *Id.* If a proper statement is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a future date.

applications in a decision issued on October 18, 2012. (T. 15-25). The ALJ's

determination became the final decision of the Commissioner when the Appeals Council

denied plaintiff's request for review on December 6, 2013. (T. 1-6).

## II. **ISSUES IN CONTENTION**

Plaintiff makes the following claims:

(1)     The ALJ improperly determined that plaintiff's impairment did not meet
        Listing 12.05(C) for mental retardation. (Pl.'s Br. at 3-7) (Dkt. No.12).

(2)     The ALJ's residual functional capacity ("RFC") determination was not
        supported by substantial evidence. (Pl.'s Br. at 7-10).

(3)     The ALJ improperly failed to consult a vocational expert. (Pl.'s Br. at 10).

Defendant argues that the Commissioner's decision was supported by substantial

evidence. (Def.'s Br at 6-14.) (Dkt. No. 14). As discussed below, this court agrees with

the defendant and recommends dismissal of the complaint.

## III. **APPLICABLE LAW**

### A.     **Disability Standard**

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI

disability benefits must establish that he or she is "unable to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment

which can be expected to result in death or which has lasted or can be expected to last

for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)

(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity
> that he is not only unable to do his previous work but cannot, considering
> his age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him [per se] disabled . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Selian v. Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012)); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that his impairment prevents him from performing his past work, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); *Selian*, 708 F.3d at 418 & n.2.

**B.     Scope of Review**

3

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian*, 708 F.3d at 417 (quoting *Talavera v. Astrue*, 697 F.3d at 151; *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera*, 697 F.3d at 151 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id.* *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot

"'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## IV.  **FACTS**

As of the date of the administrative hearing in September 2012, plaintiff was 52 years old[2]. (T. 111, 281).  He completed schooling through the ninth grade in regular education classes.  (T. 38, 115, 281).  He resided with his wife, and had three adult children who lived on their own.  (T. 44).  Plaintiff worked in the construction and carpentry field for twenty years, which included framing and installation of windows and building trusses for residential and commercial structures.  (T. 33).

Plaintiff had the tips of the middle and ring finger on his right (dominant) hand amputated as the result of a workplace accident in 1985.  (T. 18, 266).  His index finger was surgically repaired.  (T. 40).  Plaintiff noted that the amputation affected his ability to hold a pen and write, but did not describe any impact on his ability to perform construction work.  (T. 40).

Plaintiff had back surgery in March 1996, and ceased work in 1997 after seeking treatment for continued back pain.  (T. 92, 98).  Plaintiff returned to construction work briefly in 1999, but stopped after three weeks.  (T. 37, 115).  He also briefly worked as a self-employed carpenter in 2006.  (T. 34, 213).  With these short-term exceptions, Plaintiff has not been employed since 1997.

In addition to the impairments of his back and right hand, plaintiff also reported

---

[2] Plaintiff was 42 years old on the date last insured.

neck and shoulder problems, a learning disability, depression, sinus problems, and blurry vision. (T. 18, 113-114, 125-133). Plaintiff noted that certain household activities, such as lawn mowing, were adversely affected by his current back pain, but that he was able to engage in a hobby of small engine repair, cook meals, assist his wife with shopping, and socialize with friends. (T. 39, 267).

The ALJ's decision provides a detailed statement of the medical and other evidence of record. (T.17-21). Rather than reciting this evidence at the outset, the court will discuss the relevant details below, as necessary to address the issues raised by plaintiff.

## V.    ALJ's DECISION

The ALJ first noted that although she was required to consider all the medical evidence, in order to qualify for DIB, the plaintiff must establish disability before his last date insured. (T. 15). Thus, for purposes of this case, the ALJ considered whether plaintiff was disabled before March 31, 2003, the date that plaintiff was last insured. (T. 17).

The ALJ found that plaintiff had not been engaged in substantial gainful activity between the alleged onset date of October 1, 1997 through his date last insured of March 31, 2003, based upon a consideration of the plaintiff's testimony and wage information, together with the evidence as a whole. (T. 17). Next, the ALJ determined that through the date last insured, plaintiff's "degenerative disc disease of the lumbar spine, status

post laminotomy[3] and discectomy[4], and status post amputation of the tips of the fingers of the right hand" were "severe" impairments. (T. 17). The ALJ also found that plaintiff's ankle problems, diabetes, neck and shoulder problems, blurry vision, reported learning disability, and depression were not "severe" impairments during the relevant time period. (T. 18).

At the third step, the ALJ determined that plaintiff's impairments did not meet or medically equal the criteria of the listed impairments in Appendix 1 to 20 C.F.R. Part 404, Subpart P., including the listings for disorders of the spine and mental retardation. (T. 18). The ALJ analyzed the requirements in each section, particularly Section 1.04, 1.05, 1.08 and Section 12.05 and stated the reasons why plaintiff's impairment did not meet those requirements. (T. 18). In making the determination regarding Section 12.05, the ALJ found that plaintiff did not meet subsection C[5] because, although he had a full scale IQ of 70 and other severe physical impairments[6], he did not have the "requisite deficits in adaptive functioning." (T. 16). In reaching this conclusion, the ALJ cited plaintiff's testimony that, notwithstanding his IQ of 70, he had worked as a framer and

---

[3] A laminotomy is a procedure in which an opening is made in a lamina (the posterior part of the spinal ring that covers the spinal cord or nerves) to approach the intervertebral disc or neural structures. http://www.spine-health.com/glossary/laminotomy

[4] Discectomy is the surgical removal of part or all of a vertebral disc that has herniated. http://www.spine-health.com/glossary/discectomy

[5] Plaintiff does not allege that he meets the requirements of subsections A or B or D. Thus, this court will primarily confine its discussion of Listing 12.05 to subsection C.

[6] Subsection C requires that the individual have ***both*** a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05(c).

truss builder for twenty years, and that this carpentry work included measuring and fitting windows. (T. 18). In addition, the ALJ noted the plaintiff's testimony that he took public transportation, socialized, and enjoyed working on small engines as a hobby. (T. 18).

At step four of the sequential analysis, the ALJ found that plaintiff had the RFC to perform the full range of light work through the date last insured, reaching this decision based on the available medical records and plaintiff's testimony. (T. 18-21). The ALJ noted that there was no medical opinion evidence addressing plaintiff's functional abilities from his alleged onset date through his last date insured. (T. 20). Instead, the ALJ reviewed the available treatment records for the relevant time period and the subsequent medical opinion evidence relating to each of plaintiff's impairments.

Other medical issues raised by plaintiff, including diabetes and shoulder pain, did not appear in the plaintiff's medical records until after the date last insured. (T. 20, 266-67). Similarly, an orthopedic consultative exam performed by Dr. Elke Lorensen and a psychiatric consultative exam performed by Christina Caldwell, Psy. D. were each completed more than eight years after the date last insured. Accordingly, the ALJ gave little weight to this medical opinion evidence from February 2012, noting that it did not address plaintiff's physical or mental condition during the relevant period of October 1, 1997 to March 31, 2003.

The ALJ found that, to the extent that plaintiff testified to greater restrictions than those found in his medical records, his testimony was not credible. (T. 19). This determination was based upon plaintiff's own testimony regarding his daily activities,

his statements to treating physicians and consultative medical examiners, and the documented observations of the medical professionals. (T .43, 54, 115, 180, 206, 209).

The ALJ found that, through the date last insured, plaintiff did not retain the capacity to perform any of his past relevant work. (T.21). However, "considering the [plaintiff']'s age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the [plaintiff] could have performed." (T.21). Accordingly, based on a residual functional capacity for the full range of light work, the ALJ determined that plaintiff was not disabled from the alleged onset date of October 1, 1997 through the date last insured. (T. 22).

## DISCUSSION

### VI. Listing Analysis

#### A. Legal Standard

The plaintiff argues that the ALJ erred in his listings analysis by finding that plaintiff did not meet the requirements of Listing 12.05(C) for mental retardation. Listing 12.05 states in pertinent part:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.

> The required level of severity for this disorder is met when the requirements of A, B, C, or D are satisfied.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. To meet Listing 12.05, a claimant must satisfy the diagnostic description in the quoted introductory paragraph, in addition to the criteria in any one of the four subparagraphs that follow. *Douglass v. Astrue*, 496 F.

9

App'x. 154, 157 (2d Cir. 2012); 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00(A) ("If your

impairment satisfied the diagnostic description in the introductory paragraph and any

one of the four sets of criteria, we will find that your impairment meets [Listing

12.05].").  The additional criteria for subsection 12.05(C) are:

> A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(C).

### B. Application

In this case, plaintiff meets the first part of section 12.05(C).  In his most recent

IQ test, administered by consultative examiner Dr. Caldwell in March 2012, plaintiff's

full-scale IQ was 70. (T. 283).  Although the IQ test was performed more than eight

years after the date last insured, it is appropriate to presume, in the absence of any

evidence of a change in plaintiff's intellectual functioning, that plaintiff's IQ is

relatively constant over time.  *Vasquez-Ortiz v. Apfel*, 48 F. Supp. 2d 250, 257-58

(W.D.N.Y. 1999) (collecting cases).  Plaintiff also satisfies the second factor under

section 12.05(c) by having a physical impairment imposing an additional and significant

work-related limitation of function.  Notwithstanding some variations in the case law,

the court concludes that the ALJ's finding that the plaintiff suffered from several other

"severe" impairments was sufficient to establish that plaintiff had other physical or

mental impairments that imposed additional and significant work-related limitations of

function under Listing 12.05(C).  *See, e.g.*, *Decarlo v. Astrue*, 8:06–CV–488

(LEK/VEB), 2009 WL 1707482, at *4 & n.6 (N.D.N.Y. June 17, 2009) (the regulations

indicate that the proper test for evaluating an impairment, other than low IQ, under Listing 12.05(C) is the same test used at step two of the sequential evaluation to determine whether an impairment is "severe."); *Antonetti v. Barnhart*, 399 F. Supp. 2d 199, 203-204 (W.D.N.Y. 2005).

The crux of the ALJ's decision, and the focus of plaintiff's challenge, is whether plaintiff suffered "deficits in adaptive functioning," as necessary to qualify under Listing 12.05. Although the Social Security regulations do not define the phrase, lower courts in this Circuit have clarified its meaning. Deficits in adaptive functioning denote "an inability to cope with the challenges of ordinary everyday life." *Carrube v. Astrue*, 3:08-CV-830 (FJS/VEB), 2009 WL 6527504, at *4 (N.D.N.Y. Dec. 2, 2009) (citation omitted), (Rep't-Rec.), *adopted*, 2010 WL 2178499 (N.D.N.Y. May 28, 2010). "Adaptive functioning includes a claimant's effectiveness in areas such as social skills, communication, and daily living skills." *Id.* (citation omitted). As another case in this District has elaborated:

> Although the Commissioner has not defined the term "deficits in adaptive functioning" the plain language of the regulations does not require a complete lack of adaptive functioning. . . . *see generally Rivera v. Schweiker*, 717 F.2d 719, 722 (2d Cir. 1983) ("The claimant need not demonstrate that he is completely helpless or totally disabled."). Indeed, the American Psychiatric Association's criteria for mental retardation require deficits or impairments in adaptive functioning in only two out of eleven areas. DSM–IV 49 (4th ed. 2000) (listing areas of adaptive functioning as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety). Although the Commissioner has not adopted the DSM–IV criteria, . . . the term "deficits in adaptive functioning" must allow for adaptive functioning in some areas, as long as deficits are present in other areas of functioning.

*Barton v. Astrue*, 3:08–CV–810 (FJS/VEB), 2009 WL 5067526, at *8 (N.D.N.Y. Dec. 16, 2009) (some citations omitted).

In reaching the conclusion that plaintiff did not demonstrate the requisite deficit in adaptive functioning to meet the 12.05(C) Listing, the ALJ noted that the plaintiff had been employed for approximately 20 years as a framer, which involved measuring and fitting windows, and had also briefly worked as a truss builder. (T. 18, 134). The ALJ further relied on the plaintiff's testimony that he took public transportation, socialized, and enjoyed working on small engines. (T. 18, 43). This court's review of the remainder of the record supports the ALJ's conclusion. For example, plaintiff testified that he could "tear a small engine apart and put it back together." (T. 43). While plaintiff dropped out of school in the ninth grade at age 16, plaintiff is married, has raised three children, assists with household chores and food preparation, and helps care for the family dog. (T. 35, 126, 129, 281). Plaintiff has a driver's license, and the record shows that he drove himself thirty miles to the consultative examination. (T. 129, 281).

It is the province of the ALJ to consider and resolve conflicts in the evidence as long as the decision rests upon "adequate findings supported by evidence having rational probative force." *Galiotti v. Astrue*, 266 F. App'x 66, 67 (2d Cir. 2008) (citing *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002)). In this case, the ALJ properly considered the totality of the record evidence, and her determination that plaintiff did not demonstrate the requisite deficits in adaptive functioning was supported by substantial evidence.

## VII.  Residual Functional Capacity ("RFC")

### A.  Legal Standard

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R §§ 404.1545, 416.945.  *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)).  An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F. Supp. 456, 460 (W.D.N.Y. 1987)).  The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence.  *Trail v. Astrue*, 5:09-CV-1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *7).

### B.  Application

Plaintiff argues that the ALJ erred in her RFC analysis when she failed to take into consideration the non-exertional impairments imposed by plaintiff's back impairment (including numbness in the right leg), intellectual functioning, and loss of manipulation in his right hand.  (Pl's Br. at 7-10).  However, this court finds that the ALJ's determination of plaintiff's RFC, through the date last insured, was supported by

substantial evidence.

As noted above, the ALJ determined that plaintiff retained the ability to perform the full range of light work. (T. 18). Light work involves lifting no more than 20 pounds at a time, with frequent lifting or carrying of objects weighing up to 10 pounds. 20 C.F.R. § 404.1567(b). When the weight lifted is "very little," a job is still in the light work category when it requires "a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." *Id.* The regulations also state that in order for an individual to be considered capable of performing a "full or wide range" of light work, he or she must "have the ability to do substantially all of these activities." *Id.* Finally, if the individual can perform light work, there is a presumption that he or she can do sedentary work, "unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." *Id.*

The ALJ is not required to reconcile every shred of evidence in the record. *See Schneider v. Colvin*, No. 3:13-CV-790, 2014 WL 4269083, at *2 (D. Conn. Aug. 29, 2014) (citing *Miles v. Harris*, 645 F.2d at 124); *Lockwood v. Colvin*, No. 12-CV-973, 2014 WL 3894494, at *9 (W.D.N.Y. Aug. 8, 2014) (citing *Miles, supra*). However, the ALJ's review of the applicable medical evidence addressed each of the issues raised by plaintiff.[7]

For example, the plaintiff argues that the ALJ's RFC analysis is void of any

---

[7] While the plaintiff did not directly challenge the ALJ's assessment of plaintiff's credibility, this court finds that the ALJ appropriately performed the requisite credibility assessment consistent with 20 C.F.R. § 404.1529 as part of its RFC analysis.

discussion of the non-exertional limitations associated with plaintiff's back pain. However, the ALJ's decision includes an analysis of the plaintiff's back problems and the available medical records. The ALJ noted that plaintiff appeared to have responded well to his 1996 laminotomy and discectomy through the date last insured. (T. 20). In July 2000, plaintiff noted back pain (T. 204), but by August 2000, plaintiff reported that "he has not noticed a big difference as far as his back pain goes but he does seem to tolerate it a lot better and seems to have more control." (T. 205). In December 2000, Plaintiff reported that he was reducing his use of Ultram on his own volition, because according to the treatment notes "most of the time [he] does not need it that much." (T. 206). During his December 2000 physical exam, the claimant was noted to have exhibited a normal gait, 5/5 strength in his legs, and negative straight leg raises.[8] (T. 206). In May 2001, plaintiff reported that "he hadn't had much of a problem" with back pain, and was no longer taking Ultram. (T. 209). As these were the only treatment notes prior to his date last insured addressing plaintiff's back pain post-surgery, the ALJ concluded that this impairment did not negatively impact his RFC. (T. 20). The ALJ also reviewed the report prepared by consultative examiner Dr. Elke Lorensen on February 24, 2012, which focused on plaintiff's complaints of back pain and right shoulder pain. This report found that plaintiff had a "good" prognosis with moderate restrictions for bending, mild restrictions for climbing stairs, and moderate restrictions for reaching and pulling with the right arm. (T. 268). The ALJ gave this report little

---

[8] A positive straight leg raise result would be indicative of a herniated disc.
http://www.webmd.com/back-pain/medical-history-and-physical-exam-for-a-herniated-disc

weight, as it was prepared more than eight years after the date last insured, and Dr. Lorensen's report did not address plaintiff's condition for the relevant period of October 1, 1997 to March 31, 2003. In addition, the medical evidence showed that plaintiff had developed additional health concerns, including diabetes, which was diagnosed in 2010 (T. 267), and the shoulder problem, which first manifested in 2011. (T. 266). Plaintiff's back problems also appear to have worsened after the date last insured, as shown by the January 18, 2011 report from Dr. Rina Davis of New York Spine and Wellness Center. Dr. Davis made findings consistent with right L5 radiculpathy with possible right S1 nerve root involvement, and plaintiff reported numbness in his right leg. (T. 194, 266). Therefore, it was within the ALJ's discretion to discount Dr. Lorensen's report and the subsequent treatment notes, as not demonstrating impairments which existed prior to the date last insured. *See Jones v. Sullivan*, 949 F.2d 57, 60 (2d Cir. 1991) (finding that ALJ properly discounted medical opinions which did not address plaintiff's condition prior to the date last insured). The ALJ found no medical evidence showing any complications arising from the partial amputation of two fingers on plaintiff's right hand. The ALJ also considered plaintiff's testimony that he had worked in construction, was able to fish, and enjoyed performing small engine repairs before concluding that plaintiff's fine manipulation skills were "relatively good" through his date last insured. (T. 20).

Similarly, the ALJ evaluated the medical evidence related to plaintiff's intellectual functioning and diagnosis of depression. While plaintiff was diagnosed with depression in 2000 and was prescribed Celexa (T. 204), the ALJ found no clinical

findings showing that claimant exhibited objective signs of depression through his date last insured. (T. 20).

Dr. Caldwell's consultative examination, which was performed in March 2012, found that plaintiff was able to follow and understand simple directions and instructions, but was limited in his ability to perform tasks independently and to maintain attention and concentration. (T. 278-79). While plaintiff's memory skills were deemed to be impaired, Dr. Caldwell found that his intellectual functioning was average. (T. 278). Dr. Caldwell opined that plaintiff had difficulties caused by cognitive defects, physical limitations, and depression/anxiety. However, her opinion did not address plaintiff's capacity to perform light or sedentary work, and, like Dr. Lorensen's opinion, did not (and likely could not) address plaintiff's condition as of the date last insured. The ALJ discounted this report after evaluating the objective medical evidence of plantiff's mental impairment and plaintiff's work history prior to his back injury and her determination was supported by substantial evidence.

For the reasons set forth above, the ALJ properly weighed the record evidence. The court concludes that her finding with respect to plaintiff's RFC during the relevant insured period was based on substantial evidence.

## VIII. Vocational Expert

### A. Legal Standards

Once the plaintiff shows that he cannot return to his previous work, the Commissioner bears the burden of establishing that the plaintiff retains the RFC to perform alternative substantial gainful work in the national economy. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004). In the ordinary case, the ALJ carries out this fifth step of the sequential disability analysis by applying the applicable Medical-Vocational Guidelines ("the Grids"). *Id.* The Grids divide work into sedentary, light, medium, heavy, and very heavy categories, based on the extent of a claimant's ability to sit, stand, walk, lift, carry, push, and pull. 20 C.F.R. Pt. 404, Subpt. P, App. 2; *Zorilla v. Chater*, 915 F. Supp. 662, 667 n.2 (S.D.N.Y. 1996). *See also* 20 C.F.R. §§ 404.1567 & 416.967. Each exertional category of work has its own Grid, which then takes into account the plaintiff's age, education, and previous work experience. *Id.* Based on these factors, the Grids help the ALJ determine whether plaintiff can engage in any other substantial work that exists in the national economy. *Id.*

"Although the grids are 'generally dispositive, exclusive reliance on [them] is inappropriate' when they do not fully account for the claimant's limitations." *Martin v. Astrue*, 337 F. App'x 87, 90 (2d Cir. 2009) (citation omitted). When significant nonexertional impairments[9] are present or when exertional impairments do not fit

---

[9] A "nonexertional" limitation is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only the claimant's ability to meet the demands of jobs other than the strength demands. 20 C.F.R. §§ 404.1569a(c), 416.969a(c). Mental impairments are clearly nonexertional.

squarely within Grid categories, the testimony of a vocational expert is required to support a finding of residual functional capacity for substantial gainful activity. *McConnell v. Astrue*, 6:03-CV-521 (TJM), 2008 WL 833968, at *21 (N.D.N.Y. Mar. 27, 2008) (citing, *inter alia*, *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986).

"If a claimant has nonexertional limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert[,]" rather than relying solely on the Grids. *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (*citing Bapp*, 802 F.2d at 605). The mere existence of a nonexertional impairment does not automatically require consultation with a vocational expert, nor does it preclude reliance on the Guidelines. *Bapp*, 802 F.2d at 603. The requirement for a vocational expert is triggered when a nonexertional impairment causes an "additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Id*. at 605-06. The appropriateness of applying the Grids and the necessity for expert testimony must be determined on a case-by-base basis. *Id*. at 605.

### B.     Application

The plaintiff contends that the ALJ erred, at step five, by improperly relying solely on the Grids when plaintiff's purported non-exertional limitations required consultation with a vocational expert. As discussed in section VII, above, the ALJ concluded that there was no basis in the medical or other evidence to find that plaintiff was significantly physically or mentally limited in his ability to perform light work

through the date last insured, and this conclusion was supported by substantial evidence. Accordingly, the ALJ was not required to further evaluate these purported limitations at step five or to consult with a VE. *See Zabala*, 595 F.3d at 411 ("[t]he ALJ found that Petitioner's mental condition did not limit her ability to perform unskilled work"; [t]hus, her nonexertional limitations did not result in an additional loss of work capacity, and the ALJ's use of the [Grids at step five] was permissible"); *Lawler v. Astrue*, 512 F. App'x 108, 111-12 (2d Cir. 2013) (no vocational expert necessary when ALJ properly found that plaintiff could perform "basic work activities," notwithstanding some sources opining that plaintiff had "moderate difficulties" in concentration and dealing with others).

This court has found that the ALJ's RFC determination is supported by substantial evidence, and that the ALJ properly found that plaintiff retained the ability to perform the full scope of light work as of the date last insured. Accordingly, there was no need to call for the testimony of a VE at step five of the disability analysis.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the decision of the Commissioner be affirmed, and the plaintiff's complaint be **DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d

Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


Dated: March 16, 2015

Hon. Andrew T. Baxter
U.S. Magistrate Judge